JACK C. LIU, INTERIM CITY ATTORNEY, SBN 248963
REBECCA L. MCKEE, Assistant City Attorney, SBN 289485
DEBRA K. COOK, Deputy City Attorney, SBN 250114
**OFFICE OF THE CITY ATTORNEY – CITY OF RIVERSIDE**
3750 University Avenue, Suite 250
Riverside, California 92501
Telephone (951) 826-5567
Facsimile (951) 826-5540

Attorneys for Defendants
EVAN WRIGHT, an individual, and ABEL SORIA, an individual

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC H. SALDIVAR,<br><br>    Plaintiff,<br><br>v.<br><br>POLICE OFFICERS EVAN WRIGHT, ABEL SORIA, et al.<br><br>    Defendants. | CASE NO. 2:20-cv-02081-CAS-PD<br><br>*[Assigned to Hon. Christina A. Snyder, Courtroom: 8D]*<br><br>**DEFENDANTS' OBJECTIONS TO THE MAGISTRATE'S REPORT AND RECOMMENDATION REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Complaint Filed: 03/03/20<br>FAC Filed: 03/23/22<br>Trial Date: TBD |

## I.  INTRODUCTION

This case is about a felon on parole who reached for a loaded handgun in his shorts pocket and turned towards the officers when they were attempting to arrest him. As was demonstrated by the facts, Plaintiff Eric Saldivar has no standing, and even if he did, there are no facts to support his two causes of action for allegedly violating the Fourth and Fourteenth Amendment. In addition, the facts have established as a matter of law that Officer Wright and Officer Soria are entitled to

qualified immunity. For these reasons, Defendants object to Magistrate Donahue's recommendation that denies the Defendants' Motion for Summary Judgment.

## II. THE FACTS DEMONSTRATE PLAINTIFF DOES NOT HAVE STANDING TO BRING THIS ACTION

### a. *The Evidence Shows the Decedent Held Out E.R. as His Child*

Defendants object to the Magistrate's recommendation finding in favor of Plaintiff on the issue of standing. First, Defendants met their burden in showing that Decedent Ernie Saldivar had a daughter, E.R. (minor child) with non-party Xochilt Vanessa Robles. Decedent and Robles were married shortly after their child was born. Although there were no paternity tests confirming biological status and the Birth Certificate does not list the Decedent as the father, those are not required for a presumption of paternity under the Family Code. Defendants argued in the MSJ that the paternity presumption in Family Code Section 7611(d) applies because the Decedent held E.R. (minor child) to be his daughter. (See pg. 15 of the MSJ). Family Code Section 7611(d) provides that a person is presumed to the natural parent of a child if the person: "(d) The presumed parent receives the child into their home and openly holds out the child as their natural child." *In re Jerry P.* (2002) 95 Cal. App. 4th 793, 804, discussed the presumed father status in detail. A presumed father status is achieved if the father becomes married to the mother after the birth, receives the child as his own, and openly holds the child as his natural child. (*Id.* at 809.)

The record shows that the Decedent took E.R. (minor child) to school, attended parent-child functions, and spent time with her. Defendants produced a photograph of a framed drawing depicting Decedent and E.R. (minor child) with the caption "*Daddy's Little Girl*" that was taken at Decedent's residence on 1/28/218 (See Document 111-2, at pg. 54; Screen Shot below for the Court's convenience). This is clear evidence that Decedent held E.R. to be his daughter.

CITY ATTORNEY'S OFFICE
3750 UNIVERSITY AVE., STE. 250
RIVERSIDE, CA 92501
(951) 826-5567



In addition, the police report indicated that Xochilt Vanessa Robles told officers that on 1/28/18, she went to the Decedent's "residence to get money to support their shared daughter" (See Document 111-2, at pg. 46). In the same police report, it is noted that Xochilt Vanessa Robles reported that the Decedent called her and requested that she "come to his residence to pick up child support money for their daughter." (See Document 111-2, at pg. 49). Plaintiff submitted no evidence to contradict any of this evidence.

Instead, the Magistrate found that Decedent did not hold out E.R. as his "natural" child based solely on the phrasing of Plaintiff's deposition testimony wherein he allegedly told the Decedent to "love her *like* your own daughter." It should be noted that before Plaintiff's deposition, Defendants previously filed a Motion to Dismiss on the issue of standing, so the Plaintiff was well aware that the issue of paternity was critical in this litigation and it was in his interest to dispute. The Magistrate interpreted Plaintiff's self-serving testimony to mean that that the

Decedent could have had an adoptive relationship with E.R. as opposed a natural relationship (See pg. 16-17 of the Magistrate's Report). The Magistrate believed this one line in Plaintiff's deposition testimony was enough to create a genuine dispute of material fact as to whether E.R. was Decedent's natural child. (See Op. 17.) However, Plaintiff's speculative testimony is unsupported since Plaintiff spent almost his entire life in prison and had no relationship with the Decedent. Plaintiff was in prison and did not see Decedent or E.R. Although Plaintiff's speculation about his son's paternity should have held no weight at all, the Magistrate relied entirely on that speculative testimony to determine Plaintiff had standing.

  b. <u>The Evidence Shows Plaintiff Lacked a Meaningful Relationship With the Decedent</u>

Defendants also argued in the Motion for Summary Judgment that Plaintiff lacked standing because he had an insufficient familial relationship with Decedent since Plaintiff was incarcerated the overwhelming majority of Decedent's life. Moreover, after Decedent was convicted of his first felony in 2004, he was prohibited from communicating with other inmates. Defendants cited in their moving papers Plaintiff's own admissions at deposition that he did not change Decedent's diapers, did not know much about Ernie's life, had little involvement in his life, and the last time he saw Ernie was in 2001. However, the Magistrate found that there was a triable issue of fact regarding their familial relationship. Although Plaintiff and Decedent were both convicted felons who prohibited from communicating, the Magistrate found there was evidence they somehow maintained a relationship over the phone despite the fact that Plaintiff admitted he had been in solitary confinement <u>with no communication privileges</u> for a total of 25 years. Although Plaintiff did not present any evidence to dispute this fact, the Magistrate did not find it "compelling" because Plaintiff did not indicate "which

years he did not have access to a phone." Because Plaintiff was not able to recall the specific dates that the 25 years of total solitary confinement began and ended, the Magistrate found a triable issue of fact.

However, this finding is not supported by case law. As courts in the Ninth Circuit have held, Plaintiff must provide evidence of an "enduring relationship with some assumption of parental responsibility" to establish standing. The Magistrate's Report acknowledges that the legal propositions from *Kirpatrick* and *Wheeler* that a party can lack standing if they have an insufficient familiar relationship are relevant in this action (See Magistrate's Report at ln.18-22, pg. 20). Notwithstanding, the Magistrate found a triable issue of fact regarding Plaintiff's familial relationship with the Decedent because he testified at deposition that he would try to see the Decedent whenever he was briefly out on parole. However, the record demonstrates that during Decedent's life, Plaintiff was only out on parole for: <u>2 weeks</u> when he was 2 years old in 1988, <u>2 months</u> when Decedent was 3 years old in 1989, and for <u>2 months</u> when Decedent was 13 years old in 1999. (See Defendant's MSJ at pg. 11). During each of these very brief limited periods that Plaintiff was not incarcerated, Plaintiff stayed with his father instead of with Decedent at his mother's house (which meant he was limited to visitations during these brief periods). Notably, courts have found that a minor child even living every day with a person for 2 months was insufficient to establish standing. *Nash-Perry v. City of Bakersfield,* 2021 WL 3883681, at *14 (E.D. Cal. Aug. 31, 2021). Both Decedent and Plaintiff made decisions in their lives to become incarcerated, which does not excuse their lack of a relationship under the law. As the evidence showed, Plaintiff does not have a protected interest based on his lack of relationship with Decedent.

## III. THE FACTS ESTABLISH THE DEFENDANTS USE OF FORCE WAS REASONABLE

Defendants argued in the Motion for Summary Judgment that that the officers' use of deadly force was reasonable because the Decedent was armed and turned to face the officers 2 separate times resulting in 2 volleys of shots, which justifiably made the officers fear for their safety. The Magistrate found that there is a triable issue of fact as to whether the Decedent posed an immediate threat of safety to the officers because: 1) witness Lisa Castillo & Stephanie Lucio did not see a bulk in Ernie's shorts that could have been a gun, 2) the gunshot residue found on the Decedent's hands could "be consistent with the fact that Decent was just shot multiple times", 3) witness Lisa Castillo testified she never saw Ernie reach into his pockets for a gun, and 4) the Magistrate interpreted that the officers' statements were inconsistent as to what they saw when they fired their weapons. Each of these findings by the Magistrate is not supported by the evidence as set forth below.

### 1. *The Loaded Firearm*

Although Plaintiff presented no evidence to dispute the fact that Decedent had a loaded firearm in his pocket (See SMF No. 54), the Magistrate's recommendation failed to address Decedent's loaded gun. Instead, the Magistrate apparently placed more weight on the testimony of 2 witnesses that they did not see Decedent's gun to find that Decedent was not armed. It is inappropriate to exclude physical evidence on the word of interested family members. Notably, Ms. Castillo admitted at deposition that she had been drinking beers in the garage for several hours leading up to the incident. (See SMF No. 26). Whether or not a lay witness who is under the influence of alcohol can see a gun covered by a suspect's baggy clothing is not the standard. Officers are trained to identify weapons when they make contact with suspects and qualified immunity is determined through the

perceptions of the officers. The uncontroverted evidence is that the Decedent had a loaded gun in his right shorts pocket during the officer involved shooting.

### 2. *Decedent's DNA Was on the Gun and GSR Residue Was On His Hands*

In addition to not considering the fact that the Decedent had a loaded firearm in his pocket, the Magistrate's findings failed to address that the Decedent's DNA was found on the gun. (See SMF No. 55). Testing confirmed that Decedent's DNA was on the grip, trigger and slide of the firearm and there was GSR residue on Decedent's right hand. (See SMF No. 55), The Magistrate's opinion however, ignored this evidence because she believes it is "capable of multiple interpretations". (See Magistrate's Report at ln. 3-9, pg. 33). The Magistrate opined that the gunshot residue on Ernie's hands did not establish that he posed a threat to the officers because Decedent could have had gunshot residue from being "just shot multiple times." Defendants object to this ruling as it is not logical and speculative. There is no logical explanation or evidence that supports the gun residue on his hand was from something other than reaching for his handgun. The Magistrate erred in making these evidentiary rulings, which was her reason for finding triable issues with Defendants' version of events. Since there is no genuine dispute as to Decedent reaching and touching the handgun that was in his front right pocket, summary judgment should be granted.

### 3. *The Furtive Movement*

The Magistrate concluded that because courts are required to view evidence in the light most favorable for Plaintiff, that she had to use Plaintiff's version of events without considering how Plaintiff and Defendants' evidence fits together. The Magistrate's Report failed to address the fact that Ms. Castillo admitted at deposition that she lost sight of the Decedent several times during the officer involved shooting which would explain why she did not see the Decedent reach for his gun.

   First, Ms. Castillo admitted at deposition that she had left knee problems, so she was slow to get on the ground when the officers first arrived. During that time, she was focused on lowering herself to the ground without aggravating her knee which required her to place her left leg out to the side and slowly crawl into a laying position on the ground and empty her pockets. (See SMF No. 33-36). During these initial moments, she would not have been able to see Decedent initially reach into his pockets for his gun.

   Second, Ms. Castillo admitted at deposition that after she got on the ground, based on her line of sight, she could <u>not</u> see the right side of Decedent's body as he moved towards the laundry room. (See SMF No. 37). This is another moment in time, based on the witness' own admission, she was unable to see the Decedent reach his right hand into his right pocket.

   Third, Ms. Castillo also admitted at deposition that after Decedent entered the laundry room, she lost sight of him. (See SMF No. 38). Therefore, she also did not see the Decedent reach for his gun in the laundry room.

   So even assuming Ms. Castillo's testimony as true in the light most favorable to Plaintiff that she did not see the Decedent reach in his pocket for his gun, that does not negate these moments where she admitted lost sight of him during which the Decedent in fact reached for his gun. Due to these gaps in time, Ms. Castillo's testimony cannot create a triable issue of fact. Similarly, witness Stephanie Lucio's testimony does not create a triable issue as to the Decedent's furtive movement because she was not in the garage when Decedent first reached for his gun and she too admitted at deposition that she could not see his right hand when he came into the laundry room because she was only looking at this face. (See SMF No. 45-47). In addition, she lost sight of the Decedent's face while he was still standing in the laundry room, which is consistent with him looking back at the officers. Thereafter, she escorted her kids to another room. (See SMF No.

45-47). Because Ms. Lucio was not present for the entire encounter, her testimony that she did not see the Decedent reach for a gun is not dispositive and cannot be used to create a triable issue of fact.

### 4. *The Officers' Differing Viewpoints at Various Points in Time Are Consistent As the Decedent Rapidly Moved From the Garage to the Laundry Room*

The Magistrate's Report identified what she believed to be "inconsistencies" with the Officers' statements. However, the Magistrate failed to consider that Officer Wright and Officer Soria had different viewpoints as they approached the Decedent from slightly different angles in a rapidly evolving split-second encounter. The Magistrate took issue with how the officers described the 2nd volley of shots in the laundry room and at what point the Decedent started to fall. (See Magistrate's Report at pg. 32). However, the Magistrate failed to consider the circumstance in which the second volley occurred. After Decedent entered the laundry room, he turned to directly face the officers head on. He was no longer running away, but had essentially taken a fighting stance to confront the officers in the laundry room. Whether Officer Wright or Officer Soria fired first in the laundry room is irrelevant. They both perceived a very real threat to their lives as the Decedent was trying to pull his gun out of his tangled shorts while directly facing them. Whether or not the Decedent was still standing fully upright when all of the shots were fired in the laundry room is also irrelevant because the uncontroverted evidence is the Decedent was still aggressively digging in his pocket and looking back at the officers as he went to the ground. (See SMF No. 52). An armed suspect can still shoot at an officer after they have started to fall and even when they are on the ground. Below is a screens shot from Officer Soria's declaration in support of the motion depicting what he saw as the Decedent went to the ground still digging in his pockets for his gun.



2:20-cv-02081-CAS-PD   Document 111-2   Filed 05/09/24   Page 8 of 97   Page ID #:1520

It should be noted that witness Lisa Castillo admitted she could not see any of these events during the second volley in the laundry room while she was laying in the garage. Likewise, witness Stephanie Lucio could not see these events unfold because the Decedent blocked her view as he was standing in the laundry room and she quickly rushed her kids into another room. As a result, there is no evidence to dispute the officers' sworn statements that the Decedent continued to pose a threat to them as he went to the ground during the second volley of shots.

### IV.   As a Matter of Law, Defendants are Entitled to Qualified Immunity under the Law

The Magistrate recommended denying qualified immunity because when she used Plaintiff's version of events, the decedent was unarmed, did not reach for his pockets, did not turn towards the officers, and did not make any furtive movements. To support her recommendation, the Magistrate's Report cites to *Garner, Andrews,* and *Estate of Lopez* was mistaken. (See Magistrate's Report at pg. 34.) However, those cases are not factually similar at all. In *Garner,* the suspect was unarmed. Here, the Decedent was armed with a loaded handgun in his front right pocket and his DNA was found on the gun. *Andrews* involved a non-threatening situation involving a person with a known violent history. Again, the

incomparable facts make *Andrews* inapplicable. *Estate of Lopez* involved a toy gun and a child. None of these cases have applicable analysis to the facts of this case. Yet these cases were relied upon by the Magistrate to find that the use of force was objectively unreasonable. (See Magistrate's Report at pg. 34.)

The Magistrate relied upon facts that were not in evidence, and ignored facts that were in evidence, to find that Defendants were not entitled to qualified immunity. (See Magistrate's Report at pg. 35-36.) As was discussed above, the undisputed facts demonstrate that Decedent was reaching in his pocket for his loaded handgun to shoot at the police. Defendants should be entitled to qualified immunity as was thoroughly explained on pages 19-25 of Defendants' Motion.

While the Magistrate believed there are genuine disputes of material facts, no evidence support these findings. Decedent, a parolee, was warned repeatedly to put up his hands, did not comply, reached for his loaded handgun, and was shot in response. No evidence supports a contrary finding that Decedent was unarmed simply walking into the house in a non-threatening manner and was shot for no reason. Based on the undisputed facts, summary judgment should be granted in favor of Defendants.

## V. CONCLUSION

Defendants object to Magistrate Donahue's Report & Recommendation and respectfully request a *de novo* review of the facts, which demonstrate Defendants are entitled to judgment as a matter of law.

DATED: December 10, 2024                OFFICE OF THE CITY ATTORNEY

By: _____
Attorneys for Defendants EVAN WRIGHT and ABEL SORIA