JAMES JOHNSON, City Attorney, SBN 234962
REBECCA L. MCKEE-REIMBOLD, Asst. City Attorney, SBN 279485
NADIN S. SAID, Sr. Deputy City Attorney, SBN 309802
AISHA C. NOVASKY, Deputy City Attorney, SBN 328120
**OFFICE OF THE CITY ATTORNEY – City of Riverside**
3750 University Avenue, Suite 250
Riverside, California 92501
Telephone: (951) 826-5567
Facsimile: (951) 826-5540
orange@riversideca.gov

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

ERIC HENRY SALDIVAR, SR.

Plaintiff,

v.

RIVERSIDE POLICE DEPARTMENT, ET AL.

Defendants.

**CASE NO.: 2:20-cv-02081-CAS-PDx**

**DECLARATION OF AISHA C. NOVASKY IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE NO. 3**

Operative Complaint Filed: 03/23/2022
Pretrial Conference: 12/07/2026
Trial Date: 01/10/2027

**<u>DECLARATION OF AISHA C. NOVASKY</u>**

I, Aisha C. Novasky, declare the following:

1. I am an attorney at law, duly authorized to practice before this Court. I am a Deputy City Attorney with the Riverside City Attorney's Office, attorneys of record for Defendants Abel Soria and Evan Wright in the instant case.

2. I have personal knowledge of the matters stated herein, except those stated upon information and belief, and to those matters, I believe them to be true. If called to testify to the matters herein, I could and would testify competently thereto.

**LOCAL RULE 7-3 CONFERENCE**

3. On November 3, 2026, at 2:00 p.m., I spoke with Plaintiff's counsel to discuss the instant motion. The parties reached an impasse, thereby resulting in the filing of Defendants' Motion in Limine No. 3.

**EVIDENCE**

4. Attached hereto as **Exhibit A** is a true and correct copy of excerpts of a December 4, 2023 deposition of Stephanie Lucio.

5. Attached hereto as **Exhibit B** is a true and correct copy of excerpts of a March 9, 2018 interview with Defendant Abel Soria.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 9th day of November, 2026, at Riverside, California.

By:

______________________________

Aisha C. Novaskv. declarant

CITY ATTORNEY'S OFFICE
3750 UNIVERSITY AVE, STE. 250
RIVERSIDE, CALIFORNIA 92501
(951) 826-5567

# "Exhibit A"

Yes, over here (indicating).
(Whereupon Defendants' Exhibit B was marked for identification.)
BY MS. McKEE-REIMBOLD:
02:31 Q Maybe I'll have you mark with an H the area that you were helping the kids do homework.
A Over here (indicating).
Q Thank you. And so as you were helping the kids do homework -- I'm sorry. Let me see if I have another.
02:31 Strike that.
How much time had passed in between the last time you went into the garage until the shooting occurred?
A I don't know.
Q Less than an hour?
02:31 A Yeah, way less.
Q Less than 30 minutes?
A Yeah.
Q Less than 15 minutes?
A I know I went out there, because I asked Sam
02:32 something about the homework thing. Maybe less than 20 minutes.
Q So when you heard the gunshots, what did you do?
A At first, I didn't even know. I thought it was a firework or something loud, because they would do
02:32 fireworks around there sometimes. I didn't -- I wasn't

02:32
sure what it was, and then that's when my son, he asked to get an orange. I was like, "Go ahead. Get an orange," and that's when he grabbed the orange, and then that's -- there was big glass sliding doors that we have.

Q That (indicating)?

A Yes. My son was like right here where this chair is, and this door was closed, and they -- he was standing here from getting the orange, and he said, "Mom, I got the orange." That's when Ernie was stumbling in, and they shot him again, and he fell on the floor, and I yelled at him, "My kids are in the fucking house. What's wrong with you," but I didn't realize that he was already shot. I was just more focused on my son and the glass shattering behind him. He had glass on his -- I want to say it was his jacket that he had on, and if he didn't move that second, he would have been got (sic).

Q And so --

A And then when I -- like I felt until this day it bothers me, because I was like, "What the fuck is wrong with you? My kids are in the house." Then all I heard was (gasp), and he was gone, and the last thing he heard was me yelling at him, but I wasn't -- I didn't know. It was just all so much at the time.

Q Do you want a take a break? I think we have some tissues.

THE VIDEOGRAPHER: I can get it.
MS. McKEE-REIMBOLD: Thank you.
THE WITNESS: My son before that, he was a premie. He was only four pounds. So like it's hard because, you know, we almost lost him then, and then another time because I didn't understand like what --
BY MS. McKEE-REIMBOLD:
Q So after, did you take the kids into a different location?
02:34 A I took -- we have my older boys' back room. It's -- so you go to the back and then go this way, and one room, it looks like a -- it has like a walk-in closet kind of thing. I put them in there, because it's -- I've always felt like if there's an earthquake or something, that would be safe.
Q Uh-huh.
A So I put them in there, and then I came running back out, and I'm like, like, "What's going on," and I had a pink phone case. I had my phone in my hand, and that's when the cops threw me on the floor, and they told me, "What do you have? What do you have?" I'm like, "It's a phone. It's a pink phone case." Like -- and they all had the guns on me. Like, I'm not doing anything.
Q So in Exhibit B, where were you -- actually, we might have a better view from this diagram, which I'll

# "Exhibit B"

JOHNSON: Okay, and actually just something also---Just like when you---Just to go back just a little bit. When you entered---because you had said that you were number two in the stack. Now, when you entered the garage, I mean what was your---if you can recall, like what was your movement to---once you got into the garage? Did you fan out? Did you guys remain in the stack or---

SORIA: No. I---We fanned out, because I could feel my partner, he was next to me. I could feel him next to me, and we were kind of spreading out a little bit, but making our way towards the suspect.

JOHNSON: Okay. Which way did you---I guess once you entered, since you were the number two, which way did you go if you remember, left or right?

SORIA: I---You know, honestly, I think maybe I went straight towards him. I don't---I can't recall, but I know my partner did fan out to my---I believe it was my right side.

JOHNSON: Okay.

SORIA: He did fan out to one of the sides.

JOHNSON: Okay. Now, when he was going in the house, what was going through your mind at that time, when he made it into the house?

SORIA: When he was going towards there, I'm just thinking he's trying to get that gun to shoot us, that's what I'm thinking, and then just kind of quickly, I'm---just because we do a lot of SWAT training and stuff like that, I'm like shoot, you know, like who is in this house, you know. I don't know who's in there. Are other additional homeys inside the house, or are there you know, kids or something like that, so I'm like you know, what's he going to go---I---It just---I was trying---I was thinking of all kinds of things, you know, I just wasn't sure what was going on there. My first concern is all right, is he going to his homeys, does he have additional friends inside the house, and then my next instinct was what if there's kids in there, you know, what if he's going to hurt a kid or something like that.

RIVERSIDE POLICE DEPT - Restricted Information
Public Records Act Request
Unauthorized Release PROHIBITED
JPEDROZA 12/19/2019 11:01 AM