MICHEL F. MILLS, SBN# 193002
THE LAW OFFICES OF MICHEL F. MILLS
155 N. Riverview Drive, Suite 208,
Anaheim Hills, CA 92808
T. 714.769.9051
F. 714.685.1500
Michel@mfmillslaw.com

Attorneys for Plaintiff Eric H. Saldivar

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC HENRY SALDIVAR,<br>Plaintiff,<br><br>v.<br><br>POLICE OFFICERS EVAN WRIGHT, ABEL SORIA, et al.,<br>Defendants. | Case No. 2:20-cv-02081-CAS-PD<br><br>PLAINTIFF SALDIVAR'S MEMORANDUM OF CONTENTIONS OF FACT AND CONCLUSIONS OF LAW.<br><br>District Judge:<br>Hon. Christina A. Snyder<br><br>Magistrate Judge:<br>Hon. Patricia Donahue<br><br>DATE: 12.07.26<br>TIME: 11:30 A.M.<br>COURTROOM: 8D<br><br>FAC Filed: 03.23.23<br>Final Pretrial Conf. 12.07.26<br>Trial Date: 01.05.27 |

TABLE OF CONTENTS

I. INTRODUCTION AND OVERVIEW OF CLAIMS........................................ .........1

II. CONTENTS OF MATERIAL FACT...................................................... .........2

III. OPERATIVE CLAIMS.................................................................................. .........9

IV. CONTENTIONS OF LAW ................................................................................9

1. First Cause of Action..................................................................................9

A. Violation of Civil Rights, Title 42 U.S.C. Section 1983, Based on Violation of Decedent Ernie D. Saldivar's Fourth Amendment Right to Be Free from Unlawful Seizures (Excessive Force)..........................................................................9

B. The Elements of the Claim.....................................................9-10

C. Potential Defenses..........................................................................10

D. Legal Authorities Supporting Plaintiff's First Claim................ .......10

2. Second Cause of Action............................................................. .......25

A. Violation of Civil Rights, Title 42 U.S.C. Section 1983, Based on Violation of Plaintiff Eric H. Saldivar's Fourteenth Amendment Due Process Right to Familial Association.......... .......25

B. The Elements of the Claim.........................................................25

C. Potential Defenses..........................................................................25

D. Legal Authorities Supporting Plaintiff's Second Claim............ 26-27

V. BIFURCATION OF ISSUES........................................................................ .......27

VI. JURY TRIAL.................................................................................................. .......27

VII. ATTORNEY'S FEES..................................................................................... .......27

VIII. ABANDONMENT OF ISSUES.........................................................................27

# TABLE OF AUTHORITIES

## UNITED STATES SUPREME COURT CASES

*Graham v. Connor*, 490 U.S. 386, 395 (1989)....................13-15,23

*Tennessee v. Garner*, 471 U.S. 1, 11 (1985)....................12, 13,15

*Lehr v. Robertson*, 463 U.S. 248, 261 (1983)....................25

*Saucier v. Katz*, 533 U.S. 194, 201 (2001)....................11

## UNITED STATES CIRCUIT COURT CASES

*Act Up!/Portland v. Bagley*, 988 F.2d 868, 871-72 (9th Cir. 1993)....................11

*A.K.H. v. City of Tustin*, 837 F.3d 1005, 1012 (9th Cir. 2016) ....................12-13

*Bryan v. MacPherson*, 630 F.3d 805, 823 (9th Cir. 2010).................... 13,23

*Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014).................... 12,15

*Curnow v. Ridgecrest Police*, 952 F.2d 321, 324-325 (9th Cir. 1991).................... 15,25

*C.V. v. City of Anaheim*, 823 F.3d 1252, 1256 (9th Cir. 2016)....................12

*Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001).................... 13,15

*Doe v. Petaluma City Sch. Dist.*, 54 F.3d 1447, 1450 (9th Cir. 1995)....................11

*George v. Morris*, 736 F.3d 829, 836 (9th Cir. 2013)....................12

*Glenn v. Wash. Cty.*, 673 F.3d 864, 871 (9th Cir. 2011)....................13, 15,21

*Gonzalez v. City of Anaheim*,747 F.3d 789, 791 (9th Cir. 2014).................... 11,12

*Gravelet- Blondin v. Shelton*, 728 F.3d 1086, 1092 (9th Cir. 2013)....................23

*Harris v. Roderick*, 126 F.3d 1189, 1203-04 (9th Cir. 1997)....................12

*Hopkins v. Andaya*, 958 F.2d 881, 887 (9th Cir.1992).................... 12,20

*Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946-47 (9th Cir.2017) ......13

*Lopez v. Gelhaus*, 871 F.3d 998, 1005 (9th Cir. 2017)........................................ ......12

*Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011)................................13, 15,23

*Maraziti v. First Interstate Bank*, 953 F.2d 520, 523 (9th Cir. 1992) ............ ......11

*Ochoa v. City of Mesa*, 26 F.4th 1050, 1056 (9th Cir. 2022)............................. ......26

*Penny v. Azmy*, 2024 U.S. App. LEXIS 2934, at *3 (9th Cir. 2024)....................14,23

*Robinson v. Solono County*, 278 F.3d 1007, 1014 (9thCir.2002).................... 12,20

*Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002)...........................................12-13

*Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)............................................ 11,15

*S.R. Nehad v. Browder*, 929 F.3d 1125, 1137 (9th Cir. 2019) .......................... ......14

*Ting v. United States*, 927 F.2d 1504, 1511 (9th Cir. 1991)............................. 12,15

*Vos v. City of Newport Beach*, 892 F.3d 1024, 1033-34 (9th Cir. 2018)......... ......23

*Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1057 (9th Cir. 2018)........... ......26

*Zion v. Cty. of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017)......................... ......20

District Court Cases

*Atabekova-Michaelidis v. City of L.A.*, 2023 U.S. Dist. LEXIS 209740 (C.D.CA. 2023).................................................................................................................. ......26

FEDERAL STATUTES

42 U.S.C. § 1983........................................................................................1, 9,24-25

42 U.S.C. § 1988.................................................................................................. ......26

CALIFORNIA STATUTES

California Code of Civil Procedure *§ 377.10* ............................................................25

California Code of Civil Procedure *§ 377.11* ............................................................25

California Code of Civil Procedure *§ 377.30* ............................................................25

California Probate Code § *6401* ...............................................................................25

California Probate Code § *6402* ...............................................................................25

California Probate Code § *7000* ...............................................................................24

California Probate Code § *7001* ...............................................................................24

Comes now Plaintiff Eric H. Saldivar, individually and as Successor in Interest to Decedent Ernie D. Saldivar, who hereby files this Memorandum of Contentions of Fact and Conclusions of Law pursuant to Local Rule 16.3.

## MEMORANDUM OF CONTENTIONS OF FACT AND CONCLUSIONS OF LAW

### I. INTRODUCTION AND OVERVIEW OF CLAIMS.

Eric H. Saldivar brings this action to recover damages for the injuries he and his son, Decedent Ernie D. Saldivar ["Decedent"], suffered because Defendants Evan Wright and Able Soria fired two [2] separated volleys of gunfire from his semi-automatic pistol, from an arm's length distance, the first struck Decedent as he walked away and second struck Decedent after he fell to the ground. The Defendants never saw Decedent hold or possess any type of weapon before or during the Shooting, yet they began shooting him within one to two seconds from when the saw him for the first time. They stopped shooting approximately fifteen [15] seconds after they started. Decedent succumbed to these fatal injuries within minutes.

Plaintiff Saldivar will seek to recover the damages the Decedent suffered, and that he suffered, as a result of the injuries Defendants Wright and Soria caused by alleging two claims at trial. Plaintiff Saldivar, as successor in interest to his son Decedent Ernie D. Saldivar, alleges the first claim under 42 U.S.C. §1983, Use of Excessive Force, in violation of Decedent's Fourth Amendment Rights against Defendants Wright and Soria. Plaintiff Saldivar's second claim, also pursuant to 42 U.S.C. §1983, is for violation of his individual Fourteenth Amendment loss of familial relationship with Decedent against each Defendant. The common gravamen of Plaintiff's claims is that Defendants Wright and Soria fatally injured Decedent Ernie D. Saldivar by and through their respective unlawful uses of deadly force.

## II. CONTENTIONS OF MATERIAL FACT.

In the late afternoon of March 8, 2018, Decedent sat in a chair near the back-wall of a two car garage at his cousin Samuel Romo's new home in Jurupa Valley. Another cousin, Lisa Castillo, joined Mr. Romo and Decedent in the garage with the vehicle door [the "garage door"] partially closed spending time together, listening to music, talking and drinking beer. Mr. Romo's wife, Stephanie Lucio, was just inside the residence tending their six very young children. This particular garage sits slightly above, and parallel to, the street facing west and opening to perpendicular two-car driveway that sloped down to the street. Ms. Castillo's car occupied the first parking slot next to the garage, and its length paralleled the partially opened garage door. The setting Sun told Ms. Castillo it was time to leave, so, at about 5:30 p.m. Mr. Romo walked her out to her car while Decedent remained seated with a beer.

Unknown to them Riverside Police Officers, including Defendants Evan Wright and Able Soria, had been surveilling them from about five (5) houses west of the home. Decedent had violated the terms of his parol. Defendants Wright and Soria were prepared to arrest him, but only if they happened to get lucky and find him in public. They were told Decedent would be at the house but did not know if he was. They had no plan to enter the home and were unprepared to do so: they had no warrant or lawful exception to enter the home, were outside and some distance from their primary jurisdiction and lacked the resources typically available to them, had not prearranged such support from the Sheriff's Department. They had no idea Ms. Lucio and her six young children were in the house, no intention to keep them safe and no resources for doing so. Their operation was first and foremost to conduct surveillance and to confirm Decedent's location.

However, the defendants' view into the garage was ver limited. The partially closed garage door blocked the upper portion of the entrance, and an

SUV and Ms. Castillo's car blocked the lower section. These obstructions prevented the defendants from seeing much, if anything, inside the garage. They claim to have seen three adults in the garage while admitting their limited view caused them to lose sight of the occupants when they walked into the garage. They could not see Decedent sitting in his chair near the back wall without entering the garage. They suspected he was one of the occupants but could not confirm this even with binoculars. So, to confirm if Decedent was there, Defendants Wright and Soria decided to enter the private residence at 9931 Willowbrook Road, illegally, without a warrant.

Defendant Wright, followed by Soria and two other officers took up a position outside the garage to make their entry. Defendant Soria was "*designated less lethal*," a weapon that shoots 40mm sponges, but made no effort to use it. His practice is: "*Always lethal*" and only uses it when: "*Like if I get a suspect, he's you know*, ***hands up***, ***uncooperative***, I'm going to holster up, and then I'll be primary less lethal on that subject." *111-2* at 74-75, 76:8-21.

While hugging Mr. Romo and saying her goodbys in the space between the partially closed garage door and her car, Ms. Castillo saw people wearing black uniforms duck under the garage door shouting only:"Get down" or "hands." They did not say they were police officers, never announce a warrant and gave no warnings they would use deadly force. *121-15* at 84; *111-4* at 79-80; *111-2* at 76. Ms. Castillo saw Decedent, seated in the chair against the back, right corner of the garage, saw his reaction to Defendants, and she had an unobstructed view of his person and actions through the first half of the incident. *121-15* at 46-47, 54-55, 60-61, 81, 84. When she heard "Get down," Ms. Castillo saw Decedent push his beer off the table, stand up while turning to his right and walk quickly toward an adjacent laundry room door, *id.* at 28, 32, 36-37, 44-45, 49, 55, that Wright said was about ten feet away from Decedent, *111-4* at 9, 19, while Soria emphasized that he did not run. *111-2* at

65-67, 88. Neither Defendant would see a gun. *111-2* at 5:2-3; *111-4* at 6.

As Decedent stood-up, Ms. Castillo had an unimpaired view of his right and front sides: his right arm, right hand and right pocket. His turn rotated his right side away from Ms. Castillo and towards the back wall and rotated his front side toward and past her position, giving her an unimpaired view. *121-15* at 46-47, 54-55, 60-61, 81, 85. He kept his hands to his front, and her view of his hands was unblocked. The same rotation put his right arm and hand to the opposite side of his body from the defendants who now faced his backside. She watched Decedent as he walked, saw his hands, and she saw them clearly until he began to reach the laundry room door. *121-15* at 46-47, 54-55, 60-61. He made no attempt to put a hand into a pocket or to move them toward his waistband. He did not attempt to threaten the officers and made no threatening moves. Except for walking to the door, he made no "other movements or gestures" not even to look back at the officers. *Id.* at 55, 66, 85-86. With his right side and right pockets closest to the back wall and because his hands were to his front with the defendants behind him, Decedent's body blocked their view of his hands. They could not see what, if anything, he was doing with his hands. *111-4* at 74-77, 84-88. While he walked, the defendants ran to within an arm's length behind him. *121-15* at 28, 32; *111-4* at 74-76, 84-85, 87; *111-2* at 74-75, 87-88. That is close enough to tackled him, to strike him with a baton and to use less lethal force weapons including their taser.

A. Defendants Did Not Shoot Decedent Saldivar Because They Thought He Posed an Immediate Threat.

1. <u>Defendant Soria Fired Without Justification</u>.

"*Maybe one or two seconds*" after he entered the garage, *111-2* at 78:22-27, Soria used lethal force and shot into Decedent's backside from an arm's length, inducing Defendant Wright to fire at point-blank range. The simple, undisputed facts that Decedent did not fire a gun, combined with Soria's

candid admissions during his post-shooting *interview* leave no doubt both Defendants used objectively unreasonable deadly force. They did not fire because they believed Decedent had a gun or because he was trying to arm himself. Before he rotated, they saw Decedent's front, hands, his basketball but saw no gun. *111-2* at 5:2-3, 76:34-77:8, 94:22-28; *111-4* at 4:16-17, 93:31 -94:3. Decedent never held let alone fired one. Soria based decided to fire within 2 seconds because he heard a gunshot:

> "*. . .* ***I hear a loud bang***, and *then I engage as well*, so it was –" ECF *111-2* at 91:7-11.
>
> * * * *
>
> "I wasn't 100% positive where [that shot] came from to be honest with you. I was like man, *was it him* that *shot me* or that shot. I wasn't 100% positive, but I did hear that ***loud bang*** [...]" *Id.* 91:16-18 [Emph. add.].
>
> * * * *
>
> "[...] so I'm like ***did he shoot*** me from here, from the hip, you know, *did my partner shoot. I couldn't really identify where it was*, and *I was like you know, somebody's trying to kill me or my partner* at that time." *Id.* at 91:23-25 [Emph. added].

The *bang* was the first shot fired. Defendant Soria attributed that first shot to Decedent: "*was it him* that shot me?," "[...] did *he shoot me* [...] from the hip?"*Id.* Defendant Soria decided that: "[...] somebody's [Decedent] *trying to kill* [him] or [his] partner [...]." *Id.* But, he never even saw a gun let alone Decedent holding one. In response to the *first* gunshot, Defendant Soria made his *decision* to shoot Mr. Saldivar: "and ***then*** I engaged ***as well***." *Id.*

However, just before he mentioned hearing the *bang*, Soria realized what really happened and stopped himself before saying it out loud:

> "As I'm engaging, as ***I'm pulling the*** – Like – It was really quick. Like as I'm ***starting*** to engage him, *I hear a loud bang*, and ***then*** *I engage as well*, so it was – . . . but *I did* ***hear*** *that loud bang* ***as I was shooting as well***, so I –" *Id.* at 91:14-18 [Emph. added].

Defendant Soria based his *decision* to fire on the sound of the shot he heard,

his own gunshot, within 2 seconds of entering the garage. He responded to the sound of his own gunshot by assuming by Decedent had fired at him or his partner and then shooting him. Soria's use of force was not objectively reasonable, and it induced Wright's equally unjustified sympathetic fire, and both shot Eric from less than five feet. They did not face an *imminent threat*, nor did they react with objectively reasonable force. Each Defendant fired several shots in this first volley and each was unnecessary and excessive. The defendants stopped shooting after about three [3] seconds, when he stopped in the laundry room doorway, before making things much worse.

2. Defendants' Second Volleys Were Objectively Unnecessary.

Defendants' point-blank gunshots struck Decedent inflicting serious injuries, yet they ignored the opportunity to take him into physical custody at the laundry room door. Ms. Lucio, having entered the laundry room from the opposite side, saw Decedent stagger into the doorway and stop. She saw him struggle to stand and to steady himself by holding on to the door and saw his injuries. She stood face-to-face with him long enough to make eye contact, note his fear and confusion expressed on his face and to yell at him for bringing "*this*" into her home. *121-16* at 31, 33, 36-37, 41, 43-44, 46 and 61.

Both Defendants remained within five feet behind Decedent as he stood holding the door with the opportunity to take him into custody. They had the time to use any of the several modalities of less lethal force at their disposal instead of lethal force. However, without trying to take him or to use less than deadly force, Defendants Wright and Soria both commenced firing a second volley from point-blank range. Their second volleys passed by Ms. Lucio, shattering the sliding glass door behind to where her son had just been standing. She saw Decedent react to gunshots to his backside that caused him to stumble forward a couple steps before falling face-down to the floor where he ended up on his stomach gasping. Ignoring yet another opportunity, both

Defendant continued shooting Decedent as he laid face-down until he succumbed. 111-2 at 71, 75, 78-79; 121-16 at 31, 36, 41-44, 61. Ms. Lucio was clear, adamant and angry Decedent was shot in the back. 121-16 at 63:10-17. Defendants never saw Decedent hold a gun, with a gun or saw a gun near him, never saw anything in his shorts, and they did not see his hands or what he was doing with them at any time before they *stopped* their second volleys of gunfire. 111-4 at 84-85, 87, 89; 111-2 at 75, 89.

B. The Totality of the Circumstances Show That Deadly Force Was Unnecessary and Unreasonable.

The totality of the circumstances may include the availability of less intrusive force, whether proper warnings were given or other factors. While officers need not avail themselves of the least intrusive means of responding to an *exigent* situation, their failure to consider clear, reasonable and less intrusive alternatives to the force employed militates against finding that the force used was reasonable.

This time the Defendants faced no exigent circumstances. They did not even know if Decedent was there, and they only confirmed he *was* there *AFTER* they entered the garage illegally. They had not intended to enter the home and had no plan for doing so. They were not prepared to enter the home as evidenced by their failure to obtain a warrant, their lack of information about who was inside and their failure to take any measures to secure Ms. Lucio or her six very young children before putting them in harm's way. They failed to obtain the resources necessary to minimize the potential collateral damage that a residential entry might cause.

As mentioned, the Defendants gave Decedent no warnings they would use deadly force before firing. They had the ability to use any number of lesser levels of force to physically take Decedent into custody when they closed in to a distance of an arm's length before Soria started shooting and again when

Decedent stopped in the doorway and stood hanging onto the door in front of Ms. Lucio. They never even tried to take physical control of Decedent before they commencing two separate volleys of multiple gunshots.

The defendants abandoned the option to use less lethal force as a matter of course before they confirmed that Decedent was there. Even if he realized this was the perfect situation to use the 40mm launcher, Soria's decision to enter with his handgun prevented him from using less lethal force because he could not make the switch in the one or two seconds between entering the garage and shooting Decedent. That is not the type of split-second decision that excuses the use of otherwise excessive force: this was a choice, a refusal to use less-lethal force and to be *always lethal*.

A reasonable officer, under these circumstances, would have known that deadly force was unnecessary and unreasonable: that Soria's initial shot and both Defendant's first volleys it triggered, from an arm's length, from behind and without warnings were unjustified; known that lower levels of force were available, appropriate and sufficient for the circumstances including, *inter alia*, tackling him from behind, striking him with a baton, stunning him with a taser or even shooting him with the 40mm *less lethal* weapon, but they chose to shoot him in the back. A reasonable officer would have known the Defendants' second volleys were also unnecessary and unreasonable if not more so. They resumed shooting, without cause, into an occupied home after having inflicted multiple, serious injuries that stopped Decedent and caused him to hold the door to remain standing, and continued shooting after he fell forward from their gunfire and remained face-down. A reasonable officer would have known deadly force was unjustified in these circumstances, and would have known that lower levels of force were available and sufficient – especially so within five feet of him. Instead, they continued shooting until he succumbed without trying to take him.

## III. OPERATIVE CLAIMS.

The operative unverified pleading is Plaintiff's Fourth Amended Complaint for Damages filed, March 23, 2023, as superceded by the Final Pre-Trial Conference Order. Plaintiff Saldivar will proceed to trial on these two claims:

l. Violation of Civil Rights 42 U.S.C. §1983 (Fourth Amendment Rights- Unreasonable and Excessive Force/Unlawful Use of Deadly Force) against Defendants Evan Wright and Able Soria;

2. Violation of Civil Rights 42 U.S.C. §1983 (Fourteenth Amendment Rights - Lost Familial Relations against Defendants Evan Wright and Able Soria.

## IV. CONTENTIONS OF LAW.

Plaintiff Eric H. Saldivar alleges the following claims in his Fourth Amended Complaint for damages.

1. First Cause of Action.

A. Violation of Civil Rights, Title 42 U.S.C. §1983, Based On Violation of Decedent Erine D. Saldivar Fourth Amendment Rights to be Free From Unlawful Seizures (Excessive Force/Unlawful Use of Deadly Force).

Against Defendants: Riverside Police Officer Evan Wright and Riverside Police Officer Able Soria.

B. Elements of the Claim:

(1) Defendants Wright and Soria violated the following clearly established federal constitutional rights of Decedent Ernie D. Saldivar:

(a) Freedom from the unreasonable seizure of his person;

(b) Freedom from a deprivation of his liberty without due process of law;

///

(c) Freedom from the use of excessive, unnecessary and/or unreasonable force;

(d) Freedom from summary punishment

(2) Defendants Wright and Soria were acting in the performance of their official duties;

(3) Defendants Wright and Soria's conduct violated Decedent Ernie D. Saldivar's rights as each of them unlawfully used deadly force to stop Decedent from walking away from them without justification supported by law. Moreover, the force that each Defendant used was grossly excessive to the amount of force necessary to accomplish their respective lawful goals;

(4) Decedent Ernie D. Saldivar and Plaintiff were harmed; and,

(5) The actions by Defendant Wright and Defendant Soria, respectively, were a substantial factor in causing Decedent Saldivar's harm.

C. Potential Defenses.

Plaintiff anticipates Defendants Wright and Soria, respectively, will argue that he is entitled to qualified immunity for his actions. However, there is no justification for the deadly force these Defendants used in circumstances of this case. Thus, Defendants Wright and Soria are left with no defense other than their respective arguments that, each of them, used only the minimum amount of force necessary to obtain Decedent's compliance with his instructions.

///
///

D. Legal Authorities Supporting Plaintiff's First Claim.

(1) The Prohibition Against the Unnecessary Use of Deadly Force Against a Nonthreatening Subject Was Clearly Established When Defendants Fatally Shot Ernie D. Saldivar.

The threshold question is whether, taken in the light most favorable to the plaintiff, the facts alleged show that the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The plaintiff bears the burden of proving the existence of a clearly established right at the time of the allegedly impermissible conduct. *Maraziti v. First Interstate Bank*, 953 F.2d 520, 523 (9th Cir. 1992). If the law is determined to be clearly established, the next inquiry is whether a reasonable official could have believed his conduct was lawful. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 871-72 (9th Cir. 1993). The defendant bears the burden of establishing that his or her actions were reasonable, *Doe v. Petaluma City Sch. Dist.*, 54 F.3d 1447, 1450 (9th Cir. 1995), and the defendant's good faith or subjective belief in the legality of his or her actions is irrelevant. Qualified immunity is inapplicable here because the available evidence, including Defendants' prior statements and bystander testimony, conflicts with the evidence Defendants proffered now. See *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994); *Gonzalez v. City of Anaheim*,747 F.3d 789, 791 (9th Cir. 2014).

(a) <u>Decedent Saldivar's Freedom From Defendants' Unjustified Uses of Deadly Force Was Well Established In March, 2018</u>.

The freedom from police officers' unreasonable use of deadly force was established before March, 2018. The use of deadly force is generally limited to circumstances where a suspect *threatens the officer <u>with a weapon</u>* or there is *<u>probable cause</u>* to believe the suspect committed a crime involving the infliction or threatened infliction of serious physical harm. *Garner*, 471 U.S. at

11. The law was clearly established that shooting a suspect less than a minute after making contact and less than a second after giving him command commands was unreasonable. See *A.K.H. v. City of Tustin*, 837 F.3d 1005, 1012 (9th Cir. 2016). The requirement that each use of deadly force in a succession must be justified at the moment the force is used was also established. *Hopkins, supra*, 958 F.2d at 887; accord, *Robinson v. Solono County*, 278 F.3d 1007, 1014 (9thCir.2002)(en banc). Shooting a person who cannot reasonably be perceived to be taking any furtive, harrowing, or threatening actions was prohibited as unreasonable, and the mere fact the subject possesses a firearm does not, alone, justify deadly force is equally long standing. *Garner*, 471 U.S. at 11-12; *Lopez v. Gelhaus*, 871 F.3d 998, 1005 (9th Cir. 2017); *George v. Morris*, 736 F.3d 829, 836 (9th Cir. 2013); *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014); *Gonzalez, supra*, 747 F.3d at 791; *Curnow v. Ridgecrest Police*, 952 F.2d 321, 324-325 (9th Cir. 1991); *Ting v. United States*, 927 F.2d 1504, 1511 (9th Cir. 1991); *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005)(en banc); *Hayes, supra*,736 F.3d 1223, 1233 (9th Cir. 2013); see also *C.V. v. City of Anaheim*, 823 F.3d 1252, 1256 (9th Cir. 2016); *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002). This is true even when the suspect allegedly "committed a violent crime in the immediate past." *Harris v. Roderick*, 126 F.3d 1189, 1203-04 (9th Cir. 1997).

(b) Defendants' Uses of Deadly Force Were Unnecessary, Unreasonable and Excessive Based on the Facts They Knew.

Whether the use of deadly force was reasonable is determined under the Fourth Amendment's objective reasonableness standard that examines the necessity for the type and amount of force used based on the facts and circumstances known to the officer at the time in light of the legitimate governmental interest at stake. *Graham, supra,* 490 U.S. at 395; *Garner, supra*,

471 U.S. at 3. The use of deadly force must be balanced against the need for it. See *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946-47 (9th Cir. 2017); *Glenn v. Wash. Cty.*, 673 F.3d 864, 871 (9th Cir. 2011); *Bryan v. MacPherson*, 630 F.3d 805, 823 (9th Cir. 2010); *Santos, supra*, 287 F.3d at 854. Lethal force – the discharge of a firearm – is objectively reasonable only when the officer has *probable cause* to believe the suspect poses a significant threat of death or physical injury to the officer or others." *Garner*, 471 U.S. at 3. Yet, courts analyze the objective reasonableness of the force used "by first considering the nature and quality of the alleged intrusion" and then considering "the governmental interests at stake" by looking at the totality of the circumstances, *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc). Force is reasonable "only when a strong governmental interest <u>*compels*</u> the employment of such force." *Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001)[Emph. added].

i. *The Intrusion on Decedent Saldivar's Interests Was "Extreme."*

The deadly force that Defendants Soria and Wright used against Decedent Saldivar was unmatched, *Garner, supra*, 471 U.S. at 9, and the intrusion on Decedent's Fourth Amendment interests - extreme. *A.K.H., supra*, 837 F.3d at 1010-11. "The suspect's fundamental interest in his own life need not be elaborated upon." *Garner*, 471 U.S. at 9.

Defendants Soria and Wright got to within an arm's length behind Mr. Saldivar before they started shooting. They were close enough to tackled him, to strike him with a baton and to use more intrusive, less lethal force weapons including their taser and their 40mm launcher. Instead, Defendant Soria and then Wright each fired a first volley when Decedent reached and opened the door. Then, they paused briefly as he staggered into the laundry room, stopped and stood face-to-face with Ms. Lucio. He was injured and steadied

himself by holding the door as he struggled to stand. He stood in front of Ms. Lucio long enough for her to make eye contact, see his face and expression and to yell at him. The defendants failed to use the opportunity to take him into custody. Instead, they both commenced a second, continuous volley of gunfire. Ms. Lucio stood in front of Decedent when Defendants' fired from behind him shattering a glass door behind her and hitting Decedent's back, causing him to step and fall forward to the floor, gasp and die.

Defendants Soria and Wright hit Decedent with more than ten (10) gunshots at point-blank range. The pathologist removed projectiles from Decedent's spinal cord, right lung, left upper-abdomen, left shoulder blade and two (2) projectiles in his left shoulder, and said he would not have survived the internal injuries to his heart, both lungs and liver. Defendants Soria and Wright's intrusion of Decedent's Fourth Amendment Rights inflicted massive physical injuries before depriving him of life.

ii. *The Governmental Interest Was Not Extreme and Did Not Outweigh Decedent Saldivar's Right to Life.*

Juries evaluate objective reasonableness by analyzing the officer's need for the type and amount of force used by considering the totality of the circumstances, including: (1) the severity of the crime at issue; (2) the presence or lack of an immediate threat to officer or bystander safety, and (3) the suspect's resistance to or evasion of arrest. *Graham, supra,* 490 U.S. 386 at 396; *Penny v. Azmy*, 2024 U.S. App. LEXIS 2934, at *3 (9th Cir. 2024). Other relevant factors include the availability of less intrusive force, whether proper warnings were given, whether officers used available cover and space to move away from the suspect. *Id.*, at *4. These factors are not exhaustive. *S.R. Nehad v. Browder*, 929 F.3d 1125, 1137 (9th Cir. 2019). But, courts can only consider facts the officers knew when they employed deadly force and cannot consider facts they did not know. *Graham, supra,* 490 U.S. at 396.; *Hayes,*

*supra*, 736 F.3d at 1232-33; *Glenn, supra*, 673 F.3d at 873 n. 8.

iii. Defendants Did Not Shoot Decedent Saldivar Because He Posed an Immediate Threat.

The "'most important'" *Graham* factor is whether the suspect posed an "'immediate threat to the safety of the officers or others.'" *Mattos, supra*, 661 F.3d at 441, 445 (quoting *Smith, supra*, 394 F.3d at 702). The use of deadly force against a non-threatening suspect is unreasonable. *Garner, supra*, 471 U.S. at 11-12; *Curnow, supra*, 952 F.2d at 324-325; *Ting, supra*, 927 F.2d at 1511. In deciding whether an *immediate threat* existed, a "simple statement by an officer that he fears for his safety or the safety of others is not enough: there must be objective factors to justify such a concern." *Mattos, supra*, 661 F.3d at 441-42 (quoting *Deorle, supra*, 272 F.3d at 1281). The fact a subject possesses a firearm is not a threat that justifies deadly force without other objective facts. *Hayes, supra*, 736 F.3d at 1233; *Curnow*, 952 F.2d at 324-325.

In the deadly force context, a court cannot "simply accept what may be a self-serving account by the police officer." *Scott*, *supra*, 39 F.3d at 915. "Because the person most likely to rebut the officers' version of events—the one killed—can't testify, '[t]he judge must carefully examine all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts,'" *Cruz, supra*, 765 F.3d at 1079(alterations in original) (quoting *Scott, supra*,39 F.3d at 915), including "circumstantial evidence that, if believed, would tend to discredit the police officer's story." *Id.*

a. <u>Defendant Soria Fired Unwittingly and Without Justification</u>.

Defendants did not fire at Decedent because they believed he had a gun or believed he was trying to arm himself. When Defendants rushed in and

towards Decedent yelling *get down*, he stood up from his seat, turned to his right and walked toward the laundry room door. Defendants faced Decedent's back when they got to within an arm's length behind him. Just one or two seconds after entering the garage, Soria *decided* to fire when:

> "***I hear a loud bang***, and *then* *I engage* *as well*, so it was –" Ex. 17 [Soria Trans.] at 26:7-12 [Emph. added].
>
> * * * *
>
> "I wasn't 100% positive where [that shot] came from to be honest with you. I was like man, *was it him* that *shot me* or that shot. I wasn't 100% positive, but *I did hear that loud bang [...]*" *Id.*, Ex. 17 at 26:14-18 [Emph. added].
>
> * * * *
>
> "[...] so I'm like ***did he shoot*** me from here, from the hip, you know, *did my partner shoot. I couldn't really identify where it was*, and *I was like you know, somebody's trying to kill me or my partner* at that time." *Id*. Ex. 17 at 26:22-25 [Emph. added].

The "bang" Soria heard was the first shot fired, and that shot occurred before Soria decided to fire. *Id*. He attributed that first shot to someone else, thinking it came from some*where* else: "*was it him* that shot me?," *id*. "[...] did *he shoot me* [...] from the hip?"*Id*. Soria concluded: "[...] somebody's *trying to kill* [him] or [his] partner [...]." *Id*. Thinking he heard someone else's gunfire, Defendant Soria responded: "and ***then*** I engaged ***as well***." *Id.*, Saying he engaged *as well*, Soria tells that he based his first decision to fire on, and in response to, the first shot he heard someone else fire, the "bang."

However, the gunshot Soria heard was *not fired* by *someone* else: Soria fired it unwittingly. Before he first mentioned the loud *bang*, Soria said:

> "As I'm engaging, as ***I'm pulling the*** – Like – It was really quick. Like as I'm ***starting*** to engage him, *I hear a loud bang*, and ***then*** *I engage as well*, so it was –"

Ex. 17 [Soria Trans.] at 26:7-12 [Emph. added]. The full passage where he attributes the shot to Decedent Saldivar, Soria said:

"I wasn't 100% positive where [that shot] came from to be honest with you. I was like man, *was it him that shot me* or that shot. I wasn't 100% positive, but *I did* ***hear*** *that loud bang* ***as I was shooting as well***, so I –"

*Id.,* Ex. 17 at 26:14-18 [Emph. added]. Soria stammers as he starts to say out loud that he fired the first shot, but, he stops himself before finishing the sentence: "As I'm engaging, *as I'm pulling the* –" Trigger? Soria does not complete the sentence knowing that he did not develop a legitimate, justifiable reason for shooting Mr. Saldivar in the one or two seconds since he entered the garage. Soria fired the first gunshot without realizing it, and in doing so, he caused the gunshot sound that he heard. Soria thought someone else had fired that first gunshot, and he attributed the shot to Mr. Saldivar – who did not fire at all. ***"Then*** *[he] engage[d] as well.*" Soria responded to that sound by shooting Mr. Saldivar based on his false assumption that Saldivar fired at him or his partner. Soria's fire induced Wright's sympathetic fire, and both shot Decedent from less than five feet. Defendant Soria fired standing next to Defendant Wright, so Wright not only knew who fired but also knew it was unjustified. A jury can reasonably conclude based on these facts that each Defendants' use of deadly force was objectively unreasonable.

b. Decedent Saldivar Did Not Threaten The Officers, Made No Threatening Moves and Gave No Indication If He Had a Firearm.

When the defendants rushed in yelling "Get down," Ms. Castillo was laying on the driveway, just outside the garage door, slightly to his right. She saw Decedent sitting near the back wall and facing out toward the garage door which put the laundry room door ["the door"] on his right side. When she heard "Get down," Decedent stood, turned to his right and walked quickly toward the door. As he stood Ms. Castillo had a clear view his front and right sides: his right arm, right hand and right pocket. Decedent turned to face the interior door, and the right turn rotated Decedent's right side away from Ms.

Castillo and towards the back wall and rotated his front side toward and past Ms. Castillo's position, giving her an unimpaired view. He kept his hands to his front, and her view of his hands was unblocked.

Ms. Castillo watched Decedent as he crossed the garage to the door, saw his hands, and she saw them clearly until he began to reach the door. She saw that Decedent made no attempt to put a hand into a pocket and did not move his hands toward his waistband. She saw that he did not attempt to threaten the officers and made no threatening moves. Except for walking to the door, Decedent did not "make any other movements or gestures" at all not even to look back at the officers. *Id*.

Both Ms. Lucio and Ms. Castillo saw no indication Decedent possessed a gun despite having close contact with him before and during the shooting. Decedent Saldivar wore lightweight basketball shorts. It would seem that anything he carried in the waistband or pockets would have been immediately obvious to anyone who looked at him. Both Ms. Lucio and Ms. Castillo *did* look at him. Both spent hours with him and saw him and his shorts during that time. Each said she did not see Decedent with any bulky or heavy object item like a gun. Mss. Castillo and Lucio saw he had no gun before or during the shooting.

c. <u>Defendants Did Not See Decedent Saldivar Hands or Did Not See Him Make Any Threatening Movements</u>.

Decedent's turn toward the door also changed what the defendants could see: just as it had rotated his hands and right side toward Ms. Castillo, it moved his hands away from the defendants' view. When he faced the door, Decedent's right side and right pockets faced the back wall; his hands were to his front; defendants faced his back; and Decedent's body blocked Defendants' view of his hands. They could not see what, if anything, he was doing with his hands.

The defendants did not mention seeing Decedent reach *into* anything when interviewed. At best Defendant Soria said *thought* he saw the decedent reach "*towards*,"but a direction is not a location. Defendant Soria could not say where Decedent reached and was no more than *pretty sure* he reached *toward* the front of his waistband or the right side of his body: "*maybe* a pocket, the waistband. I wasn't 100% positive [...] somewhere in this area, yeah, general area;" "[He] starts reaching towards – – – on his right side. It was a pocket *or* his waist. I couldn't – – – I honestly couldn't confirm, but I'm *pretty sure* it was the right side of his body." *Id*.[Emph. add.].

Defendant Wright, having fatally shot one man in 2008 and shot another man non-fatally in about 2014 showed his experience causing serious injuries and OIS interviews, by giving a rote, nondescript and vague mantra for the shooting: "he just *started* going for his waistband *or* pockets [plural]. He just started digging, and *as soon as he did that*, he turned around and ran toward the door." Yet, he could not provide any details or even identify which hand he saw Decedent use to do the alleged reaching, saying he could not remember. When recently asked if his shots struck Saldivar, Defendant Wright testified: "I couldn't tell you if I struck him or not" because "there were two shooters." Once Decedent turned toward the door, Wright faced his back, remained behind Decedent thereafter, and Decedent kept his hands in front of him. Even after his second volley, Wright did not see what – if anything – Decedent was doing with his hands, and still did not know what he had – if he had anything at all.

The defendants could not identify the objective details or specifics needed to show Decedent Saldivar posed an imminent threat. Even the claimed "reach" lacked specific, objective details about where he reached, how he reached and, importantly, how they could see his hands at all. They provided only vague generalities and contradictions. While possessing a

firearm does not, without more, justify deadly force, neither Defendant could provide an objective basis for the claimed belief that Decedent Saldivar was armed. In fact, Soria recounted a recent, first hand experience where a subject reached into his waistband, pulled out a firearm and tossed it away in surrender.

Neither Defendant saw a gun, told the investigators he saw a gun, a bulky/heavy object or anything in Decedent Saldivar's clothes at any time before he ceased fire. It is telling that neither Defendant Soria nor Wright reported to told the investigators that he had called out a warning to alert the other officers that he had seen - or thought he had seen - a gun, a bulky or heavy object or anything in Decedent's clothes before he ceased fire. If they *had* seen something that could have been a weapon, their duty required them to warn the other officers. That they did not is a fact that can lead a jury to find Defendants saw nothing. Each Defendant's first volley was unnecessary and excessive. Then they paused – and made it much worse.

d. Defendants' Second Volleys Were Objectively Unnecessary.

Each use of deadly force in a sequence must be independently justified. *Zion v. Cty. of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017); *Hopkins, supra*, 958 F.2d at 887; accord, *Robinson, supra*, 278 F.3d at 1014. Deadly force is unconstitutional if the subject no longer poses an immediate threat. *Zion*, 874 F.3d at 1076 ["But terminating a threat doesn't necessarily mean terminating the suspect. If the suspect [...] no longer pose[s] a threat, a reasonable officer would reassess the situation..."].

Defendants paused after their first volley when Decedent Saldivar posed no threat at all. He had just suffered gunshot injuries from their point-blank fire, and these injuries caused him to lean against the door for support and to stumble forward into the laundry room. Ms. Lucio reached the laundry

room just as Decedent stumbled through the door, and he stopped and stood right in front of her - face-to-face. He stood there long enough for her to make eye contact, see his face, notice his expression and to yell at him. Decedent did not threaten Defendants because he could not: "his back was turned against the door, not facing towards the door."

Decedent's injuries and close proximity provided Defendants the opportunity to take him into custody. Just as before their first volleys, the defendants stood just behind him. The defendants could have tackled him from behind, struck him with a baton, stunned him with a taser or shot him with a 40mm less lethal weapon, but, again, they refused to use that opportunity to take him into custody. But, both Defendants commenced a second, continuous volley of gunfire that shattered the sliding glass door behind Ms. Lucio and shot Decedent in the back causing him to take a couple steps and fall forward to the floor where he gasped and died.

Defendants' try to manufacture an "imminent threat" based on a subsequent report that a handgun was found after they stopped shooting in Decedent Saldivar's pocket by another officer. This fails for two reasons. First, "[e]vidence which the officers were unaware" is not relevant to evaluate the reasonableness of the officers' actions. *Hayes, supra*, 736 F.3d at 1232-33; *Glenn, supra*, 673 F.3d at 873 n.8. Defendants concede that they shot Decedent with their first *and* their second volleys of gunfire without seeing a gun, seeing his hands and without knowing he possessed a gun, without seeing anything in his shorts, and without seeing his hands or what he was doing with them.

Second, to the extent Decedent Saldivar *did* have a handgun in a pocket of his basketball shorts, the mere fact that he possessed a handgun does not justify deadly force. *Hayes, supra*, 736 F.3d at 1233; *Curnow, supra*, 952 F.2d at 324-325 (holding that deadly force was unreasonable where the suspect

possessed a gun but was not pointing it at the officers and was not facing the officers when they shot). Here, the evidence of how, where and under what circumstances the gun was found shows it was inaccessible to Decedent. Officer Monreal reported that, after he found an item in his shorts and after he determined it was a handgun, he had an extremely hard time removing it because it had tightly wrapped itself inside the fabric of the pocket. This required him to untangle the handgun just to get it out of the pocket. The gun is irrelevant to whether Decedent posed a threat, and to Defendants' conduct as a whole, because it was unknown to them and was inaccessible to Decedent.

iv. The Severity of Decedent Saldivar's Crime Did Not Justify Defendants' Use of Deadly Force.

The only crime supported by probable cause was a parole violation. Decedent's estranged wife unabashedly threatened create circumstances to send him back to prison. On August 26, 2017 she made good on her threat by falsely reporting that he shot a firearm in her direction. The defendants could never establish that Xochilt herself did not fire the gunshot she blamed on Decedent, and her allegations never developed probable cause. To avoid Xochilt, end her torment of his grandmother and to consider his options, he left, violating his parole: his crime was neither violent nor severe.

v. Decedent Saldivar Did Not Flee.

Defendants have not established that Decedent recognized they were law enforcement or fled. When they reached the house at approximately 17:30 hrs., Decedent sat near the back wall of the west-facing garage, looking out the garage door, that was opened about two-thirds, toward the setting Sun. The defendants, clad in black uniforms, entered the garage through the partially opened garage door. They advanced toward Decedent backlit by the low, setting Sun. The defendants did not announce they were police officers, never announced a warrant to enter the property and never announced who

they would arrest. Ms. Castillo heard only: "Get down. Get down." Decedent reacted by standing up, turning and walking to the door, Soria emphasized he did not run. The reasonable inference of Decedent's walk is he did not flee.

vi. Additional Factors Weigh Strongly Against Defendants' Use of Deadly Force.

The *Graham* factors are not exhaustive, and courts must examine the totality of the circumstances to determine "whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Bryan, supra*, 630 F.3d at 826; see *Mattos, supra*, 661 F.3d at 442. Other relevant factors may include the availability of less intrusive force, whether proper warnings were given, whether the officers failed to use available cover and space to move away from the suspect. *Penny, supra*, 2024 U.S. App. LEXIS 2934, at *3, *4; *Vos v. City of Newport Beach*, 892 F.3d 1024, 1033-34 (9th Cir. 2018); *Gravelet- Blondin v. Shelton*, 728 F.3d 1086, 1092 (9th Cir. 2013) (explaining "the absence of a warning of the imminent use of force, when giving such a warning is plausible, weighs in favor of finding a constitutional violation"). Although officers need not avail themselves of the least intrusive means of responding to an exigent situation, their failure to consider clear, reasonable and less intrusive alternatives to the force employed militates against finding the use of force reasonable. *Rice v. Morehouse*, 989 F.3d 1112, 1124 (9th Cir. 2021)(quotations omitted); *Smith v. Cnty. of Butte*, 2017 U.S. Dist. LEXIS 65335, at *11 (E.D. Cal. 2017)(considering whether cover was available and less lethal force options were immediately available).

Here, Defendants gave Decedent no warnings they would use deadly force before firing. They failed to use the cover provided by the cars parked in the driveway. They had a duty to use force less than lethal and to use lethal force only as a last resort when no other reasonable option is available. They had the ability to tackle Decedent from behind, to strike him with a baton, to

stun him with a taser from behind as he reached the door and when he stood in front of Ms. Lucio during their pause. They even had the ability to shoot him with the team's 40mm less lethal launcher. They chose to fatally shoot him instead of taking physical control.

As a matter of course Defendants abandoned the option to use less lethal force before they confirmed Decedent was in the garage. Despite being designated *less lethal*, Soria dismounted the vehicle and entered the garage with his firearm as his primary weapon in keeping with his personal policy: "Always lethal." Soria only uses the 40mm launcher when: "Like if I get a suspect, he's you know, ***hands-up***, ***uncooperative***, I'm going to holster up, and then I'll be primary less lethal on that subject." Even if he realized this was the perfect situation to use the 40mm launcher, Soria's decision to enter with his handgun prevented him from using it because he could not switch weapons in the one to two seconds between when he entered the garage to when he shot Mr. Saldivar. These defendants' refusal to use less lethal force was simply their choice to be *always lethal*.

A reasonable officer, under these circumstances, would have: known deadly force was unnecessary; known Soria's unwitting shot and subsequent response were unjustified; and, known that, when Defendants Soria and Wright shot Decedent from an arm's length behind, that the right thing to do was simply tackle him. Defendants could have also struck him with a baton, stunned him with a taser or shot him with a 40mm less lethal weapon, but they chose to shoot him in the back.

2. Second Cause of Action.

A. Violation of Civil Rights, Title 42 U.S.C. §1983, Based On Violation of Plaintiff Saldivar's Fourteenth Amendment Rights to Familial Association.

Against Defendants: Riverside Police Officer Evan Wright and Riverside Police Officer Able Soria.

B. Elements of the Claim:

(1) That Plaintiff had an enduring relationship with respect to Decedent Ernie D. Saldivar;
(2) Defendants Wright and Soria were acting in the performance of their official duties;
(3) Defendants Wright and Soria's conduct in the fatal shooting of Decedent Ernie D. Saldivar shocks the conscience;
(4) Decedent Ernie D. Saldivar and Plaintiff were harmed; and,
(5) The actions by Defendant Wright and Defendant Soria, respectively, were a substantial factor in causing Decedent Saldivar's harm.

C. Potential Defenses.

Plaintiff anticipates Defendants Wright and Soria, respectively, will argue that, because Plaintiff spent the majority of his life in custody, that he did not have a meaningful relationship with Decedent. However, this is a fact question for the jury to decide. Plaintiff communicated regularly with Decedent through telephone calls and letters. Even as an adult Plaintiff spoke frequently with Decedent, including about resolving his parole violation before his death. Defendants offer no evidence of Plaintiff's relationship with Decedent, only that he was incarcerated for much of Decedent's life. Here, Plaintiff grasped the opportunity and accepted some measure of responsibility for developing a relationship with his child. See *Lehr v. Robertson*, 463 U.S. 248, 261 (1983). He developed the emotional attachments that derive from raising his son. *Id*. The Court required association not physical presence. *Id*. Plaintiff maintained constant contact with Decedent during his childhood and as an adult up to his death.

D. Legal Authorities Supporting Plaintiff's Second Claim.

Familial association is a liberty interest cognizable under the Fourteenth Amendment, *Curnow, supra*, 952 F.2d at 325 (collecting cases),

and "[a]decedent's parents and children generally have the right to assert substantive due process claims under the Fourteenth Amendment." *Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1057 (9th Cir. 2018); *Hayes, supra*, 736 F.3d at 1229-30. To prevail on a familial relationship claim in the context of a police shooting, the plaintiff must demonstrate the officer's conduct "shocks the conscience," *Ochoa v. City of Mesa*, 26 F.4th 1050, 1056 (9th Cir. 2022) (internal quotation marks omitted), and an "enduring relationship[] reflecting an assumption of parental responsibility" by the plaintiff with respect to the decedent. *Wheeler*, 894 F.3d at 1057; *Atabekova-Michaelidis v. City of L.A.*, 2023 U.S. Dist. LEXIS 209740, at *14 (C.D.CA. 2023).

A reasonable jury can find Defendants' uses of deadly force shock the conscience. Defendants' entered the property unlawfully without a warrant to search the premises for Decedent or a valid exception. Both Defendants shot Decedent from behind at an arm's length distance with no warning and without justification. After injuring Decedent with point-blank gunfire, the defendants paused approximately six seconds, but they resumed their fire in second volleys without even trying to take Decedent into custody. They continued shooting until he succumbed. These defendants precluded the use of less lethal force before they confirmed Mr. Saldivar was present in the garage. A jury can find Defendants' uses of lethal force shocks the consciousness.

V. BIFURCATION OF ISSUES.

Plaintiff contends that there is no need for bifurcation as to punitive damages and in fact bifurcation may result in more consumption of court time.

///

///

## VI. JURY TRIAL.

Plaintiff demands a jury trial in the subject case. Plaintiff's Counsel approximates the trial will take 5 trial days, but this anticipated schedule depends entirely on the trial time available to the parties.

## VII. ATTORNEY'S FEES.

Plaintiff seeks attorney's fees under 42 U.S.C. § 1988.

## VIII. ABANDONMENT OF ISSUES.

Plaintiff does not intend to abandon any claims prior to trial.

DATED: 11.26.26 Respectfully submitted,

/s/ MICHEL F. MILLS

LAW OFFICES OF MICHEL F. MILLS
Attorneys for Plaintiff Eric H. Saldivar